Spaulding v. Wells Fargo, Number 121973. Austindorf, good morning. Good morning, Your Honor. May it please the Court, I'm Jason Austindorf and I represent the appellants in this case. This case is one of several actions where a distressed homeowner is attempting to enforce the mortgage servicer's obligation to provide a loan modification under the government's Home Affordable Modification Program, otherwise known as HAMP. These cases started back in 2009 when the HAMP program began, when mortgage servicers agreed to abide by the program but systematically did not abide by their obligations, often 90 percent of the time. The U.S. Treasury statistics that they report online show by simple math, simple division, that if you take the number of homeowners that the mortgage servicers admit are most likely entitled to a loan modification under this program, and then if you take a look at the number of modifications that are actually granted, if you do simple division it comes out to about 90 percent of the time, they're just flatly ignoring their obligations. One big argument that is repeatedly made in these cases is that there is no private right of action under HAMP. Repeatedly made and repeatedly successfully made. That is correct, Your Honor. But there are still cases that go forward. Although there is no private right of action under HAMP, the law does not say if there is no private right of action, there is not any type of action. The only way that you can make that argument is if preemption applies. And I believe that the Seventh Circuit in Wigod acknowledged that Wells Fargo's argument that state law causes of action are just an end-run around a private right of action for HAMP, that argument is actually an end-run around preemption. It's a flawed preemption argument. Basically, the argument is that state consumer protection actions and state common law is preempted by HAMP because it does not provide for a private right of action. The problem with that is that it's inconceivable that the government, in enacting HAMP, intended to just run over state consumer protection laws and state common law causes of action that could apply to a myriad of fact patterns, not just a mortgage servicer and a loan modification. Okay, and on the fact patterns, there's a pretty important distinguishing factor between Wigond and this case, which is there was a TPP agreement in Wigond and there is no such agreement in this case, correct? That is correct, Your Honor. The majority of cases, and I believe that they're all at the district court level, there might be one appellate opinion, it's not from this circuit, but the decisions basically chop these cases up into two different types, post-TPP cases and pre-TPP cases. Most district courts have allowed the post-TPP cases to go forward. We're not in that category, obviously. We are in the pre-TPP period. I don't see why that should make a really big difference, though. The whole underlying theory of these cases is for negligence, you have a standard of care. Well, first you have a duty. Right. And I will get to that. I guess I should probably start with the promissory estoppel or misrepresentation cases. You have statements or promises that are false or that the servicer did not intend to keep at the time that it made the promise, therefore taking what is normally a statement of a future act and making it a factual, present fact statement. What's the promise here that you're saying they did not intend to keep? As seen in their starter kits that they sent out to distressed homeowners before the homeowner actually applies for the HAMP modification, the promise is if you take time out of your life to fill out this paperwork that you don't have to fill out under the deed of trust or other mortgage documents, and if you qualify under the rules governing HAMP, which we're implicitly promising to follow, you will get a TPP. And if you make three successful timely payments on that, it will be converted in. We will offer you a permanent modification, which you can then accept, and then that TPP becomes a permanent modification. Well, what do you say about the case law that says an application doesn't do that? A simple application is not enough. The application does not constitute a promise. It's what precedes the application that constitutes the promise. The starter kits, the homeowners who receive the starter kits saying if you fill this out and if you qualify, we will give you the modification, that's a promise. But you didn't meet the if you fill this out and if you qualify, your clients didn't reach that point. We contend that they did, and the complaint alleges this. The HAMP guidelines are incredibly specific. They're 200 pages. They're online. We provided a very brief excerpt of these guidelines. They spell out to the nth degree in detail if these factors are met, you qualify. If not, you don't. I mean, it is almost the closest thing that you will get to a mathematical formula in terms of a standard of care. So the complaint alleges that they did qualify under these guidelines. And at the pleading stage, that should be sufficient. Wells Fargo has produced no guidelines showing that they did not qualify. So at this point, the complaint should be deemed true, and the case should proceed to discovery. Can we assume from your argument that we don't have to decide the threshold issue that comes about in this whole area of whether there is a private right of action under HAMP? Again, I think it's a flawed preemption argument. I really think it is a red herring. So you don't think we need to reach the issue? No. I mean, every court, even the courts that allow these cases to go forward, again, in the post-DPP period, they start out by saying there is no private right of action under HAMP. But then they say there are state common law causes of action, and there's state consumer protection causes of action, which if the elements are met, regardless of whether or not there's a private right of action, the case goes forward. I brought up the negligence claim. I wanted to talk about that briefly. Allowing a negligence claim in this case would not necessarily make a potential negligence claim whenever any consumer applies for a loan modification under any circumstances. What's special here is that we have- I'm sorry. What state law duty do you allege was breached here for purposes of negligence? The duty of due care as outlined by the standard of care. The Jake's case, the Maryland Court of Appeals Jake's case that's cited in the briefs, is the closest case to being on point. It's slightly different, as of course my opponents will point out. But that case dealt with a person who was just applying for a loan, not a loan modification. That person put up a $10,000 deposit. The duty was found in that case to use due care in reviewing the person, whether they were eligible for a loan. In this case, in all of these cases, we don't just have a $10,000 deposit. We have a whole house that can be lost. Wait a minute. You told Judge Davis that, if I understood your answer, you really don't care about whether there's a private cause of action under the federal guidelines. Correct. And I take it by your answer you mean to say that you do not rely in any way here on the existence of a federally rooted duty. Wrong. Okay, so that's good. So we're on the same page. You want to sue on a state cause of action based on the existence of a federal law duty. And you're claiming that's not a federal cause of action. Correct. We would call it a very spelled out standard of care that is spelled out by federal regulations. How can a cause of action, and this is an honest question, how can a cause of action arising from the breach of a federally imposed duty not be a federal cause of action? Because it's stated in terms of the elements of a state common law cause of action or the elements of a state consumer protection cause of action. Well, doesn't that make it a state duty? In other words, if you're saying the state law borrows a federal standard, I can follow that. Is that what you're saying? Yes. It's a state law duty that is defined by federal regulations. Federal law. Right. The state law says that if there's a standard of care, that's the standard that you should abide by if you're operating in due care. It is no different from an industry standard case. And that's where I wanted to get into the difference. With these HAMP cases, if you recognize a negligence action, it doesn't open up the floodgates to a negligence action in any case where someone's applying for a loan modification. Because you would be very hard-pressed to find an expert who cares about his credentials to come in in a non-HAMP case and say, there's an industry-wide standard of care governing when a mortgage servicer has to give a loan modification. Because that's bogus. Before HAMP, it was just left up to the servicer's discretion. They could do whatever they wanted. There was no written industry standard. Here, these cases are special because we have 200 pages of an industry standard spelled out on the Internet for anyone in the public to look at. So since we have this standard of care, and since, like in the Jake's case, the homeowner is at the mercy of the mortgage servicer, not just losing $10,000, losing their entire home, being put out on the street, the argument for the imposition of a duty is greater. That's an end run. Isn't that an end run around Congress's supposed decision not to create a private cause of action? I don't believe so, Your Honor. Again, the Congress did not put in any statute, oh yeah, if you breach HAMP, you can file a federal consumer protection claim. They didn't do that. But they did not intend to completely preempt hundreds of years of common law or decades of consumer protection cases in the states. Since a consumer protection case can apply to any misrepresentation, not just by a mortgage servicer, again, I just don't see how one can credibly argue that HAMP was designed to preempt that. With state common law causes of action, you have medical malpractice, you have all kinds of negligence that can come up. So since the negligence claim doesn't just pertain to mortgage servicers, again, I don't see how you can say that the absence of a private cause of action in HAMP was somehow meant to preempt any type of state cause of action that might apply to a mortgage servicer. So again, as the Seventh Circuit pointed out, these aren't my words, in WIGOD, the argument that there is no private right of action is in itself a flawed and run to try to get around the lack of a preemption argument. It looks like I'm running out of time. I guess the last thing I would want to say is that there have been some articles lately showing that the Supreme Court has been using the term floodgates in a lot of its opinions more frequently. A lot of distressed homeowners are really trying to save their investment, and there's this program that says that they're entitled to a loan modification. If they can assert the elements of a state cause of action, especially since it was these same homeowners, these taxpayers, who gave the bailout to the banks in the first place that obligated them into this program, I think it would be a slap in the face to the average citizen to worry about judicial convenience more so than justice, even if that means a lot of justice. Thank you. Thank you, Mr. Dasendorf. You've reserved some time for rebuttal. Ms. Barnhart. May it please the court. My name is Virginia Barnhart, along with my colleague Sarah Meyer, who is visiting the Fourth Circuit for the first time today. We're here to represent Wells Fargo in this appeal. My voice is a little light today because I'm a bit under the weather, so I'll try to keep my voice up and my remarks short. With the court's permission, I'll also withhold my hand when you greet us so I don't infect you all. This case is entirely grounded, Your Honors, in the plaintiff's contention that they were improperly denied a temporary payment plan under the guidelines that are issued to mortgage servicers under the HAMP program. As this court has recognized in your questions this morning, Congress did not provide for a private cause of action under that statute, and it is indeed an end run around Congress's decision not to do that to assert the claims that have been asserted in this case. There are three steps before you can get a TPP, a temporary payment plan. One is to make application, two is to be eligible for consideration, and three is to have a TPP plan extended and signed by two parties that are bound by it. The plaintiffs do not contend here, as was the case in Wigood on which the plaintiffs rely, that they were ever granted a TPP. What they are clearly attempting to do here, as the district court found, is use their interpretation of the HAMP guidelines to force a TPP where one was not granted, which is, in effect, seeking to enforce those guidelines. They cannot do that because Congress has not recognized a private cause of action here, but they also can't do that based on the specific facts in this case. I should point out, to the extent the court seeks to speak more broadly than to the particular facts in this case, that there's another important issue here. Wells Fargo is a mortgage servicer, and the guidelines on which the plaintiffs rely, and I might point out the ones attached to the complaint are actually not applicable in time period to the plaintiff's claims, but even still, they're not complete. The HAMP guidelines that the plaintiffs attempt to rely upon to make their claim under different labels leave open that a determination on eligibility is based on an investor standard. When I say investor, I mean the holder of the loan here. In this case, the record reflects that Wells Fargo was not the holder of this loan, but a mere servicer. So we are here with a claim trying to force a servicer, not an investor, to honor the plaintiff's interpretation of guidelines which reserve to the investor discretion whether to participate here. And that's an important note for the larger case. But here, what we also have is a case that fails on the theories advanced and on the particulars in this case. In this case, we have a factual record based on the exhibits that accompany the complaint that show that the plaintiffs made application for a TPP, that they submitted certain documents with that, that Wells Fargo, as the mortgage servicer here, acknowledged that application and asked for more documents by a specific time. So was that – the appellant, as I understand it, for proof of income submitted two pay stubs, February 12th and 19th. Why was that not sufficient to meet the application requirements under HAMP? It is not in the record here, Your Honor. But this investor required more current submissions, and so Wells Fargo, to honor its obligation to its investor, asked for those. But that's not in the record, Your Honor. But do the HAMP guidelines provide – give that discretion to the investor as to what is sufficient to meet the proof of income? It always gives the discretion to the investor, even whether to participate in HAMP here, if the investor is not one that has signed on to a participation agreement. But specifically, and this is why the period of guidelines is important in the more global discussion of these issues, there are different times where the guidelines are more specific about what kind of proof of income is acceptable in the period. But that is for those that participate. And the caret for people, for them to participate, is under HAMP for the investor to participate? The caret is? The caret is that there can be an award of funds under the Emergency Economic Stimulus Act to cover certain mortgage losses here. And while Wells Fargo is a mortgage servicer, it's also a holder of many of its own loans that it services, and it signed on to that and did receive funds, albeit under TARP in this case. Again, we're going slightly beyond the record, but to answer Your Honor's question there. It's important in this case to note that when they were asked for additional documentation, they were asked to provide it by a date certain, they neglected to do so. Their own exhibits reflect that. And on that basis, they were denied a TPP here. What's also important to note is what the cases that are binding upon this court have said here. And I'm going to direct the court's attention to the Supreme Court's decision in Astra USA versus Santa Clara County, California. That's a case that's very similar here, although it doesn't involve HAMP. It involves a similar program that was adopted by a federal agency exercising authority, general authority given to it by statute to adopt such programs. In that case, it's a program by the Health Resources and Services Administration by which drug manufacturers opted into what was called the 340B program in that case and signed a pharmaceutical pricing agreement. That's similar to the participation agreement here. That agreement was between that federal agency and the pharmaceutical companies, just like the agreement here is between Wells Fargo acting as mortgage servicer and the Department of the Treasury here. It's notable here as we talk about a cause of action and what duties arise under federal law that we don't even have a congressionally adopted act that specifically states any duty vis-a-vis a mortgage servicer. It states a duty or grants authority, I should say, to the Department of the Treasury to adopt a program. That's what the Emergency Economic Stimulus Act did. What's noteworthy in doing so, and I'm going to direct the court's attention to language from an 11th Circuit decision in the Miller case, which is cited, is that in doing so, neither the Department of the Treasury nor Congress suggested that these kinds of programs which Treasury might adopt were intended for the benefit of mortgagors such as the appellants in this case. In the Miller case, the court discusses whether there's any discernible legislative intent to create a private cause of action and notes in that case that there is none because the Emergency Economic Stimulus Act and HAMP were both designed, quote, to provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States. We all can recall that rather dicey time in our economy. That's what the Stimulus Act was intended to do, keep banks from failing. Are there other provisions enacted by Congress that are about mortgage relief? Yes, but in terms of the HAMP program adopted under the authority given to Treasury under that act, the intention there was to save the banks here. And there is nothing expressed or implied within EESA or HAMP which suggests that Congress's intention was if Treasury adopted a program to help the banks that it would give a direct or end-run cause of action to mortgagors. So for all of those people who are in a pre-TPP context, and I see a lot of these claims at the district court level about nobody returning phone calls, how difficult it is to get through the HAMP process. For all those people that are in a pre-TTP context, as a practical matter, there is no relief available for a broken-down negotiation because the bank is overwhelmed, doesn't get back to people in a timely fashion, whatever the allegation is. Your Honor, the answer to that would be yes. I think that's a choice that Congress made, and it's interesting that you bring that up. One, HAMP has a sumset provision. It was a test to see whether this worked, okay? And I think that's significant in terms of the overall intent of Treasury here that it was, in effect, an experiment here. Two, though, the Treasury wanted buy-in from servicers here. And I think that's why the answer to your question is yes, Judge Davis, because of the fact that it's recognized in Miller to create a duty to do what my opposing counsel would suggest be done in these kinds of cases, would have been to contravene, as the Miller court said, the purposes of HAMP because it would have chilled servicer participation in the HAMP program  And I think that's a notable point that is made by your colleagues in the 11th Circuit with respect to the underlying purposes of this, in effect, experiment, sun-setting experiment here. But going beyond the 11th Circuit, I think we have to go to the well of our precedent, which is the Supreme Court here in the Astor case. And when in the Astor case the Supreme Court found that there was no private cause of action emanating from the participation agreements and the federal program in that case, it didn't just stop there. It noted that, and I quote, it would make scant sense to allow them, these are parties that are not under those agreements, to sue on a form contract implementing the statute, setting out terms identical to those contained in the statute, though labeled differently, suits to enforce, and they reference the program number there, and suits to enforce participation agreements, are in substance one and the same. Their treatment, therefore, must be the same. No matter the clothing in which the plaintiffs dress their claims, there is no claim. So the Supreme Court is, in effect, already spoken here. It doesn't matter about the label. It matters what the program was intended to do. And as has been acknowledged by the plaintiffs in their brief here, there is no private cause of action. Ergo, you cannot relabel it to create a federal duty, to give a state law label to a claim. There is no duty that can give rise to a private cause of action under HAMP in a TPP scenario. Now, the underlying district court here, the District of Maryland, and the Wiggett case did recognize that things change when a contract has been entered into and signed. And that's what the Wiggett case pertains to, as I believe Judge Thacker noted in her question this morning. If the court disagrees with my analysis of HAMP, it matters not in the confines of this case, because as the lower court correctly found here, there has been no misrepresentation. The statements relied upon were not misrepresentations. The alleged promise on which the plaintiffs rely here to process their HAMP application was, as the district court found in looking at the plaintiff's complaint, met. It was processed here. They asked for additional information. That information was not forthcoming within the deadline set for it. How firm was the deadline, Ms. Barnhart? It expressly states in that letter that the information should be submitted within 10 days, the date of that letter. And we often encounter that kind of seemingly firm and penetrable barrier, and then you make a phone call or you pay a visit or something, and people say, oh, okay, I'll make an exception. That wasn't possible here. There's no such allegation, but, Your Honor, I would suggest that even if there were such an allegation in another case, and you have several of these cases that are coming before you here, several of which are being handled by my office, it wouldn't make a difference because that's that end run to imposing a duty where one does not exist here. But the promise made here, if there was a promise, and we contend there wasn't a promise to other than the Treasury Department to give this a shot under the participation agreements, but not a promise that runs to these appellants here. If there was, it was honored. It was processed. Information was requested. Deadline was not met, and it was denied on that basis. The misrepresentations on which the plaintiffs relied briefly are also not misrepresentations, as the lower court found here. The statement to process was met, and the two statements that show up in the notice of intent to foreclose were found by the court to be accurate on their face. The plaintiffs admit they were in default, and the plaintiffs admit that their mortgage document enabled the holder of the note to then enforce under its provisions. We've been a little bit outside the record. Are they still in the property? They are still in the property. Has the foreclosure been stayed or something? It is the determination of this servicer not to proceed while there's ongoing litigation. So Mr. Ostendorf, irrespective of the result in this case, has done a good job for his client. Unless the court has additional questions, I'll step back at this time. Thank you. Your Honors, I was not going to make any rebuttal argument. I just wanted to address three points that were just raised. Number one. I think that's called a rebuttal argument, but go ahead. We won't dwell on labels. Thank you very much, Your Honor. The HAMP guidelines do outline what employment information, what financial information is required contrary to the contention of my opponent. That portion of the HAMP guidelines was not attached to the complaint, and at the motion to dismiss stage, you just go with the allegations of the complaint. So since the allegations in the complaint say the HAMP guidelines were satisfied, we've met our burden at this stage. Going forward, we will certainly introduce, I think it's Chapter 4 or something, of the HAMP guidelines that say that all you need is your two most recent pay stubs, which is what was supplied in this case, which is why we alleged it in the complaint, which is the end-all, be-all at this stage. The HAMP program was enacted to save banks, but it wasn't called the Save the Bank program. It was called the Emergency Economic Stabilization Act. In addition to saving banks, government wanted to put cash in the hands of consumers because, as anyone who has even a small understanding of the economy realizes, consumer cash flow is what drives the economy. When consumers have money to spend, they spend it, which makes profits for business, and consumers have cash when they're not losing their home. They have equity. They still have some kind of an interest in their biggest investment in most of their lives. So it wasn't just to protect the banks. It was to try to stimulate some cash flow in that drastic 2008 economic period. Lastly, my colleague mentioned the Wigod case and Allen v. City Mortgage where HAMP cases were allowed to go forward. I don't like saying the HAMP guidelines. I just like to say the industry standards because that's essentially what they are for purposes of our negligence action. But the Wigod and Allen case, they didn't just have a breach of contract. They actually had what at least the Allen case did. I can't remember exactly what claims off the top of my head right now were in the Wigod case, but I know that Allen v. City Mortgage included state consumer protection claims and claims other than just a pure breach of contract. So the contention that these cases stand for the proposition that the TPP cases can only go forward because they have a contract is false since there weren't just breach of contract claims in those cases. Thank you, Your Honors. Thank you very much.
judges: Andre M. Davis, Stephanie D. Thacker, Mark S. Davis